# UNITED STATES DISTRICT COURT

NORTHERN   DISTRICT OF   ILLINOIS, EASTERN DIVISION

**UNITED STATES OF AMERICA**

v.

RODNEY TANNER,
    a/k/a "T-Mac",
KEITH L. CALVERT, and
FRED D. CALVERT JR.

**CRIMINAL COMPLAINT**

**FILED**   MAGISTRATE JUDGE KEYS

OCT 2 6 2007
October 26, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CASE NUMBER:

07CR   707

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief:

(1)   Between on or about July 24, 2007 and October 25, 2007, in Lake   County, and elsewhere, in the   Northern   District of Illinois,   defendants did,

conspire to knowingly and intentionally possess with the intent to distribute and to distribute a controlled substance, namely, in excess of five kilograms or more of a mixture containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title   21   United States Code, Section   846 ; and

(2)   On or about October 25, 2007, in Lake   County, and elsewhere, in the   Northern District of Illinois,   defendants did,

carry and possess a firearm in furtherance of the abovementioned drug conspiracy,

in violation of Title   18   United States Code, Section   924(c) .

I further state that I am a(n) Special Agent, ATF, and that this complaint is based
                                   Official Title
on the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof:   X   Yes   ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

October 26, 2007                     at   Chicago, Illinois
Date                                      City and State


U.S. Magistrate Judge Arlander Keys   _____
Name & Title of Judicial Officer        Signature of Judicial Officer

STATE OF ILLINOIS     )
                            ) SS

COUNTY OF COOK     )

## AFFIDAVIT

I, Mark Shaffer, being duly sworn depose and state as follows:

1.     I am employed as a Special Agent of the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed for over 19 years. My primary duties as an ATF Special Agent consist of investigating and assisting in the prosecution of criminal violations of federal laws governing the possession, use, and sale of firearms, including but not limited to violations of Title 18, United States Code, Sections 922 and 924. I am currently assigned to the Chicago Field Division Field Office. My duties primarily include the investigation of federal firearms offenses committed by members of street gangs and other organizations whose members engage in violent criminal activity. In addition to the investigation of violations of federal firearms laws, I also investigate related federal controlled substance violations, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, and 846, and the commission of violent crimes.

2.     During my employment as an ATF Special Agent, I have received specialized training and have personally participated in various types of investigative activity, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of

federal firearms laws; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace devices; and (g) the handling and maintenance of evidence.

3.      This Affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint alleging that RODNEY TANNER ("TANNER"), a/k/a "T-Mac," KEITH CALVERT, and FRED CALVERT, conspired to possess with the intent to distribute in excess of five kilograms of cocaine, in violation of Title 21, United States Code, Section 846, and carried and possessed a firearm in furtherance of the conspiracy, in violation of Title 18, United States Code Section 924(c). Because this Affidavit is for the limited purpose of establishing probable cause, it does not contain every fact known to me concerning the entities, individuals, and the events described in this Affidavit.

4.      The statements made in this Affidavit are based on:  (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) information provided to me and other law enforcement officers by an ATF confidential informant ("CI"); (d) review of consensually monitored and/or recorded conversations; (e) criminal history records maintained by various law enforcement agencies; and (f) the training and experience of myself and other law enforcement agents and officers.

5.      To the extent that consensually recorded communications are summarized below, those summaries do not include references to all of the topics discussed during the course of the

conversations that were recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. All quotations from recorded conversations are based on preliminary transcriptions of those conversations and/or on Affiant having personally listened to the recordings. The times provided for the consensually recorded communications are approximate. In addition, many of the consensually recorded conversations involve the use of slang terms and code words. The analysis of the meaning of the slang terms and code words are based on information provided by the CI, my training, experience, and knowledge of this investigation, other law enforcement officers' training, experience, and knowledge of this investigation, and other evidence gathered during the course of the investigation, such as physical surveillance.

6.    Part of the information contained in this Affidavit is based on information provided by the CI. The CI has been providing information to law enforcement since July 2007. Based on my experience and interactions with the CI, I have found the CI to be reliable. Among other things, the information that the CI has provided to law enforcement regarding his/her telephonic and in person conversations with the targets of the investigation has been corroborated through surveillance and the electronic recordings of some of those conversations. In addition, the CI has made recordings of telephone calls with targets of the investigation, as well as introducing an ATF Special Agent, acting in an undercover capacity (hereinafter "the UC"), to the targets of the investigation. Law enforcement officers believe that the information provided by the CI has been credible because it has been corroborated by the monitored and recorded undercover meetings in which the UC has participated, as

-3-

further described below.  The CI was charged in 2007 on state drug and weapons charges.

The CI is cooperating with law enforcement in the hope of receiving a reduced sentence on

those state criminal charges.  Based on information presently known to law enforcement, the

CI has eight prior drug convictions, one unlawful use of a weapon conviction, one criminal

damage to property conviction and one conviction for resisting a police officer.

### Background of the Investigation

7.    On or about August 1, 2007, ATF and other law enforcement agents met with the

CI concerning information that the CI had about potential criminal activity in the area of

North Chicago.  During that interview the CI stated that on July 24, 2007, at approximately

3:30 p.m., he/she was on the 1400 block of Hervey Avenue in North Chicago when an

individual known to the CI as "T-Mac," but subsequently identified by the CI as RODNEY

TANNER ("TANNER"), flagged the CI down and asked him/her if the CI knew of "any

licks" to do because TANNER needed to get some money.  The CI explained that he/she

understood the term "licks" to be a street term for an armed robbery or home invasion.  The

CI stated that he/she told TANNER he/she would look into it and then left Hervey Avenue.

According to the CI, at approximately 5:00 p.m., he/she returned to Hervey Avenue and

spoke to TANNER.  The CI asked TANNER if he had a gun, to which TANNER responded

that he did.  The CI then advised TANNER that he/she would get back in touch with

TANNER at a later date about an up and coming lick.  The meetings between the CI and

TANNER on July 24, 2007 were unrecorded.

8.    On or about August 1, 2007, at approximately 6:55 p.m., the CI met with TANNER on the 1400 block of Hervey Avenue. The CI was equipped with an electronic transmitter and recording equipment. During the meeting, the CI and TANNER spoke again about the lick and the CI told TANNER that a lick was in the works. TANNER then told the CI that he (TANNER) was interested. The CI left the meeting with TANNER at approximately 7:09 p.m. and met with law enforcement who had conducted surveillance of the meeting.

9.    On or about August 10, 2007, at approximately 10:30 a.m., the CI made a recorded call, in the presence of law enforcement, to TANNER. During the conversation, the CI indicated to TANNER that the CI's "guy" would be available later the following week and wanted to meet with TANNER to discuss the upcoming armed robbery. TANNER acknowledged the information and agreed to wait to hear from the CI.

10.    On or about September 4, 2007, at approximately 5:00 p.m., ATF and other law enforcement agents interviewed the CI concerning an unrecorded meeting with TANNER the day before. During the interview, the CI stated that on September 3, 2007, at approximately 2:00 p.m., the CI was stopped on Hervey Avenue in North Chicago by TANNER. The CI stated that TANNER asked the CI what was up with the business, which the CI understood to be a reference to the armed robbery. The CI stated that TANNER told him/her that TANNER was ready to do it now and added that "we don't even need your guy, we'll do it ourselves." The CI further stated that on September 3, 2007, at approximately

5:00 p.m., TANNER called the CI's cellular telephone and told the CI to come over to Hervey Avenue. The CI reported that while on Hervey Avenue, TANNER gave the CI his new cell phone number, 224-944-2400. The CI stated that there was no discussion about the armed robbery during this meeting and then the CI left the area.

11.    On or about September 4, 2007, at approximately 5:14 p.m., the CI made a recorded call, in the presence of law enforcement, to TANNER. During the conversation, the CI gave TANNER a cell phone number and told him to call and ask for Locito to discuss the armed robbery. TANNER replied that he would call.

12.    A short time later, TANNER called the CI's cell phone but the CI did not answer. TANNER left a voice mail message for the CI stating that every time he (TANNER) calls Locito's cell phone, the phone goes to voice mail. Soon after this message was left on the CI's phone, the CI made a recorded call, in the presence of law enforcement, to TANNER. During the call, the CI told TANNER to call Locito back.

### The UC's Contact With TANNER on or about September 4, 2007

13.    On or about September 4, 2007, at approximately 5:20 p.m., an undercover ATF agent ("UC") posing as Locito received two voicemail messages from TANNER. In both voicemail messages, TANNER introduced himself as "T-Mac," the CI's brother (meaning friend). In the second voicemail, TANNER instructed the UC to call him back at 847-473-0651.

14.    A short time later, the UC made a recorded phone call to TANNER at 847-473-

-6-

0651. A female answered the phone and said "Frank's," after which the sounds of a bar could be heard in the background. The UC asked for "T-Mac" and the woman told the UC to hold on. After a few moments, TANNER came to the phone. The UC stated that he was Locito and then stated that he did not want to say too much on the phone but that he had a "demo" (a street term for an armed robbery) and was looking for a crew to do some landscaping. The UC further stated that he was going to be traveling out of town for the next two weeks and that upon his return he would contact TANNER to arrange an in person meeting so they could discuss the landscaping job.

15.    At approximately 5:38 p.m. on the same date, the UC called TANNER again at 847-473-0651 and inquired as to which number he should use to contact TANNER. TANNER stated that the UC could call him at either 847-473-0651 or 224-944-2400.

### The UC's Contact With TANNER on or about October 4, 2007

16.    On or about October 2, 2007, the UC made a recorded phone call to TANNER at 224-944-2400. During this call, the UC and TANNER discussed plans to meet in person on Thursday, October 4, 2007 to discuss plans for the armed robbery if TANNER was still interested. TANNER agreed to meet with the UC and related that he (TANNER) was still interested.

17.    On or about October 3, 2007, the UC made a recorded phone call to TANNER at 224-944-2400. During the call, the UC and TANNER discussed plans to meet the next day regarding the armed robbery. TANNER told the UC to meet him at Frank's Lounge, located

-7-

in the area of Green Bay Road and 22nd Street in North Chicago, Illinois. TANNER further related that he would be at Frank's starting at 1:00 p.m.

18.   On or about October 4, 2007, at approximately 1:04 p.m., the CI placed a recorded call in the presence of law enforcement agents, to TANNER at 224-944-2400. During this call, the CI told TANNER that Locito was attempting to get in contact with TANNER via cellular telephone and that TANNER should answer his phone when Locito calls him. TANNER explained that he was low on pre-paid cellular minutes for his phone. TANNER further related that he was going to meet with Locito at Frank's later that afternoon.

19.   Shortly thereafter, the UC made a recorded phone call to TANNER at 224-944-2400. TANNER explained that he was already at Frank's. The UC stated that he was stuck in traffic but would be arriving shortly.

20.   At approximately 2:18 p.m. that same day, the UC met with TANNER in an undercover vehicle in the front parking lot of Frank's Lounge located at Green Bay Road and 22nd Street in North Chicago, Illinois. This meeting was recorded. During the meeting, the UC explained to TANNER that the UC was a disgruntled drug courier for a Mexican narcotics distribution organization. As a result, the UC was looking for an outside crew to conduct an impending armed robbery of approximately 20 kilograms of cocaine from the UC's drug connection. The UC stated that he usually transports cocaine for the organization once a month and usually near the end of the month. The UC explained that he will receive

a phone call the night before he has to pick up the cocaine letting him know that he will be transporting cocaine the next day and that he never knows the exact location until within the very last hour of his pick up. In addition, the UC stated that there are usually three un-identified male subject inside the "stash house" and they are usually "cutting up" 20 kilograms of cocaine when the UC arrives. While the UC waits at the front door, one of the subjects will go into a back room and retrieve the loan of cocaine for the UC to deliver.

21. The UC then asked TANNER if he had done this type of criminal activity in the past to which TANNER responded: "Hell yeah." The UC inquired whether TANNER was interested in doing the armed robbery and TANNER answered that he was interested. TANNER explained that he had three other unidentified subjects in his crew that could help with the armed robbery. TANNER also stated that he had access to two police issued 45 caliber handguns and two Tech-9 handguns. The UC and TANNER made plans to meet the following week so that the UC could meet the rest of TANNER's crew members. At approximately 2:32 pm, TANNER exited the undercover vehicle.

### The UC's Telephone Contact With TANNER on October 8-15, 2007

22. On or about October 8, 2007, at approximately 9:02 p.m., the UC made a recorded call to TANNER at 847-473-0651. During the call, TANNER explained that he had not been able to talk to his other crew member who was still out of town. The UC told TANNER that he would call TANNER the following Wednesday, October 10, 2007 to see if TANNER had made contact yet with his other crew member.

23.   On or about October 10, 2007, at approximately 5:10 p.m., the UC placed a recorded phone call to TANNER at 847-473-0651.  TANNER stated that his other crew member still had not returned home and TANNER had not spoken to him yet.  The UC and TANNER then made plans to meet the following Tuesday, October 16, 2007, so that the UC could meet TANNER's other crew member.  TANNER stated that they needed to get things moving on this.

24.   On or about October 15, 2007, at approximately 7:18 p.m., the UC made a recorded call to TANNER at 847-473-0651.  TANNER explained that his guy was back in town and that TANNER would have his guy with him at Frank's Lounge the following day (October 16, 2007) at 3:30 p.m. so that the UC could meet him.

### The UC's Contact With TANNER on or about October 16, 2007

25.   On or about October 16, 2007, at approximately 3:07 p.m., the UC placed a recorded phone call to TANNER at 847-473-0651.  During the call, TANNER reiterated that his guy would be at Frank's Lounge at 3:30 p.m.  The UC stated that he would be there soon.

26.   At approximately 3:56 p.m., the UC and another undercover federal agent (UC2) pulled into the parking lot of Frank's Lounge at Green Bay and 22nd Street in North Chicago, Illinois in an undercover vehicle (UCV).  The UCV was equipped with audio and video recording equipment and law enforcement agent were conducting surveillance of the parking lot.  Once in the parking lot, the UC called TANNER and informed him that he had arrived in the parking lot.  TANNER stated that his guys was not there yet but that he was

going to place another call to his guy to see what time he would be arriving.

27.    At approximately 4:02 p.m., TANNER exited Frank's Lounge and entered the UCV. TANNER explained that his guy was running late but that he and his guy are "good," meaning that they were ready and able to carry out the armed robbery. The UC then asked TANNER if he and his guys are good with "steel," meaning firearms, to which TANNER responded "yes". The UC explained that if TANNER and his guy would have to shoot someone inside the stash house during the armed robbery, he wanted to make sure that TANNER's guy could pull the trigger. TANNER explained that the UC did not have to worry about that. At approximately 4:09 p.m., TANNER exited the UCV and reentered Frank's Lounge to make a phone call to his guy to see what was taking him so long. At approximately 4:11 p.m., TANNER returned to the UCV and explained that his guys was very close and would be arriving soon.

28.    At approximately 4:14 p.m., TANNER began to tell the UC and UC2 about another "lick" (meaning armed robbery) for some marijuana that TANNER was about to do in a couple of days. TANNER stated that he hoped it would be dark outside when he conducts this armed robbery. TANNER then reported that he frequently conducts these "licks" for marijuana, although never in the Waukegan/North Chicago area.

29.    At approximately 4:29 p.m., an unidentified black male arrived in the Frank's Lounge parking lot driving an older model van dark in color. TANNER exited the UCV, met with the unidentified male and then both TANNER and the unidentified male entered the

-11-

UCV. Once inside the vehicle, the unidentified male introduced himself as "D". Shortly thereafter, the UC explained to TANNER and "D" that the UC was a disgruntled drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection. The UC then explained the basics of the operation and what he was looking for from the crew that would conduct the home invasion robbery.

30.    At approximately, 4:34 p.m., "D" explained that he did not want to get himself caught up in anything like that and exited the UCV. TANNER quickly turned toward the UC and assured the UC that he (TANNER) was still interested in doing the armed robbery. The UC then asked TANNER if he had anyone else in mind to help. TANNER stated that he did and the he usually does this type of criminal activity with one other guy and himself making a 2-man job. TANNER further related that "D" had been in on 5-6 home invasion robberies, but that "D" was usually the driver so may have been "spooked" because he usually does not go inside during a home invasion. TANNER assured the UC and UC2 that he (TANNER) was 150% in on this impending armed robbery. TANNER further stated that he was about to call one of his other guys because he (TANNER) was not about to pass this impeding home invasion up. At approximately 4:41 p.m., TANNER explained that he had approached the CI and told the CI that he (TANNER) needed a "lick". Soon thereafter, TANNER asked the UC to borrow the UC's phone in order to call his other guy. TANNER then placed a phone call to 224-627-8024. After speaking to his guy, TANNER explained that the guy who was enroute to meet the UC and UC2 had recently put TANNER onto the last five

"licks" that TANNER had just done.  TANNER further stated that he was tired of hitting these little petty ass licks.

31.   At approximately 5:00 p.m., TANNER exited the UCV and met with another unidentified black male in the parking lot of Frank's Lounge.  Soon thereafter, TANNER and the unidentified male entered the UCV and the unidentified make introduced himself to the UC and UC2 as "T".  The UC then told "T" the basics of the operation and the reason behind his desire to rob the cartel.  The UC explained that he was a disgruntled drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection.  After hearing this explanation, "T" stated that he was in on the home invasion.  "T" further explained that he had just returned home from beating a murder rap and this his money situation was not right either.

32.   At approximately 5:05 p.m., the UC asked "T" if he had any idea as to how he would conduct the home invasion.  "T" explained that upon entering the stash house, he might have to hit the UC about his head but would not hurt the UC.  "T" further explained that if the UC was saying that there would be multiple "bricks," meaning kilograms of cocaine, inside the stash house, the he ("T") has to come into the stash house acting like he "gets down" – which the UC understood to mean "T" may be shooting upon entering the stash house.  "T" then related that he knows that this is serious.  At approximately 5:07 p.m., "T" exited the UCV and as he exited stated "100," meaning that he is 100% in on the impending home invasion.  After "T" exited the UCV, TANNER looked at the UC and stated

-13-

that he (TANNER) has nothing but killers on his crew.   At approximately 5:09 p.m., TANNER exited the UCV.

### The UC's Contact With TANNER on or about October 24, 2007

33.    On or about October 21, 2007, at approximately 6:45 p.m., the UC made a recorded call to TANNER at 224-944-2400.  The UC asked TANNER whether he had put pre-paid minutes on his cell phone so that he would be able to receive a call from the UC. TANNER assured the UC that he had enough minutes on his phone.

34.    On or about October 24, 2007, at approximately 11:23 a.m., the UC made a recorded call to TANNER at 224-944-2400.  During the call, the UC stated that he had received the call from his drug connection and that the armed robbery would be going forward the next day (October 25, 2007).  TANNER then stated that he would be ready to go the next day.

35.    At approximately 8:28 p.m. that same day, the UC received a voicemail message from TANNER stating that the UC should call him at 847-770-7738, because TANNER did not have enough minutes on his cell phone (224-944-2400).

36.    On or about October 25, 2007, at approximately 12:20 a.m., the UC made a recorded phone call to TANNER at 847-770-7738.  During the call, TANNER stated that "T," the member of his crew who had met with the UC on October 16, 2007, had been "popped off" (meaning arrested) recently and was in custody.  TANNER further explained that his "brother" was ready to do the home invasion with him though, and that they would

-14-

be good to go.

### The UC's Contact With TANNER on or about October 25, 2007

37.   On or about October 25, 2007, at approximately 11:44 am, TANNER left a voicemail message for the UC, stating that the UC should call TANNER at 847-529-0627.

38.   At approximately 12:00 p.m. that same day, the UC made a recorded call to TANNER at 847-529-0627. The UC spoke to TANNER and told him that TANNER and his crew should be ready to go around 3 p.m. that afternoon. TANNER stated that he would be ready. TANNER and the UC agreed to meet in the parking lot of Frank's Lounge at around 3 p.m.

39.   On or about October 25, 2007, the UC met with TANNER in the parking lot of Frank's Lounge located at Green Bay and 22nd Street in North Chicago, Illinois.   At approximately 3:58 p.m., the UC and UC2 pulled into the parking lot in an undercover vehicle (UCV). The UCV was equipped with audio and video recording equipment and law enforcement agent were conducting surveillance of the parking lot.

40.   At approximately 4:00 p.m., TANNER entered the UCV with two black males. TANNER introduced them to the UC and UC2 as the members of TANNER's crew who would assist with the armed robbery.  The two black males have since been identified as KEITH L. CALVERT and FRED D. CALVERT JR.  Once TANNER, KEITH CALVERT and FRED CALVERT were all in the UCV, the UC explained the basics of the operation and the reason behind his desire to rob the cartel.  The UC explained that he was a disgruntled

drug courier who needs an outside crew to conduct an armed robbery of kilogram quantities of cocaine from his drug connection.  In addition, the UC stated that he usually sees approximately 20 kilograms of cocaine in the stash house when the UC arrives to pick up his delivery.  After hearing this explanation, TANNER, KEITH CALVERT and FRED CALVERT all indicated that they were interested in participating in the home invasion.  The UC asked whether they had participated in home invasions in the past and KEITH CALVERT and FRED CALVERT both indicated that they had.  The UC stated that if the planned armed robbery was too big a deal for them, they should let the UC know now. KEITH CALVERT and FRED CALVERT both indicated that they wanted to continue with the planned robbery.

41.    During this same conversation, the UC further inquired whether TANNER, KEITH CALVERT and FRED CALVERT had firearms to bring with them to the home invasion. KEITH CALVERT responded that they had a .25 caliber semi-automatic handgun nearby.  When the UC asked how long it would take them to get the handgun, KEITH CALVERT stated that it was in a van that he and FRED CALVERT had arrived in at the Frank's Lounge parking lot. The UC then explained that he usually sees 2-3 guys in the stash house with handguns and asked what TANNER, KEITH CALVERT and FRED CALVERT would do if they had something bigger.  KEITH CALVERT responded that they could get more firearms to use during the home invasion, including a "gauge and an SKS," which the UC understood to mean a shotgun and an SKS assault rifle. The UC then made arrangements

-16-

for TANNER, KEITH CALVERT and FRED CALVERT to go pick up the additional firearms and then call the UC.

42.    At approximately 4:10 p.m., TANNER, KEITH CALVERT and FRED CALVERT exited the UCV. Surveillance observed TANNER entering Frank's Lounge and KEITH CALVERT and FRED CALVERT entering a silver 2005 KIA mini-van ("van"). After a few minutes, surveillance observed KEITH CALVERT and FRED CALVERT leaving the parking lot in the van.

43.    At approximately 4:23 p.m., surveillance observed the van return to the parking lot of Frank's Lounge. TANNER could then be seen exiting Frank's Lounge and entering the van. After a few minutes, the UC received a call from TANNER telling the UC that TANNER and his guys were ready to go.

44.    At approximately 4:45 p.m., TANNER and KEITH CALVERT met with the UC and UC2 in the UCV in the parking lot of Frank's Lounge at Green Bay Road and 22nd Street in North Chicago, Illinois. During the meeting, the UC asked TANNER and KEITH CALVERT whether they had the guns, to which KEITH CALVERT responded "Yeah, in the van." The UC then instructed TANNER and KEITH CALVERT that they would all be proceeding to a staging area where they would wait for the call from the UC's drug connection and where they should leave the UC's share of the kilograms of cocaine after the armed robbery. TANNER and KEITH CALVERT agreed to accompany the UC and UC2 in the UCV to this staging location, but TANNER stated that he wanted FRED CALVERT

to wait in the van with the guns for further instructions from TANNER. The UC agreed to this plan.

### Arrest of TANNER, KEITH CALVERT, and FRED CALVERT on or about October 25, 2007

45.    At approximately 4:55 p.m., surveillance observed the UCV leaving the parking lot at Frank's Lounge with TANNER and KEITH CALVERT inside. Surveillance further observed FRED CALVERT standing outside the van in the parking lot of Frank's Lounge. One group of agents then maintained surveillance of FRED CALVERT and the van, while another group of agents followed the UCV.

46.    At approximately 5:00 p.m., surveillance observed the UCV arrive at the predetermined staging location. Surveillance observed TANNER and KEITH CALVERT exit the UCV with the UC and UC2. The UC then gave a predetermined arrest signal and TANNER and KEITH CALVERT were taken into custody without incident.

47.    At approximately the same time, law enforcement conducting surveillance of the parking lot at Frank's Lounge approached the van and took FRED CALVERT into custody without incident. A .25 caliber handgun was recovered from the van. The firearm is a Raven, .25 caliber semi-automatic pistol, Model P-25, Serial Number 062655. This firearm was manufactured outside of Illinois. The firearm was loaded with one round of .25 caliber ammunition and next to the firearm was one magazine loaded with 6 live rounds of .25 caliber ammunition and another magazine loaded with an unknown amount of live rounds that was wrapped in a red bandana.

### *Post-Arrest Statements from TANNER and KEITH CALVERT*

48.     After they were taken into custody, TANNER, KEITH CALVERT and FRED

CALVERT were transported to the North Chicago police station. Agents met with TANNER

individually and read him his *Miranda* rights. TANNER put his initials next to each of those

rights on the written statement of rights form indicating that he understood each right.

TANNER then signed a written waiver of those rights and agreed to be interviewed by the

agents. In a signed, written statement, TANNER admitted that he had met with the UC to

plan and participate in an armed robbery of 20 kilograms of cocaine. TANNER stated that

he had informed the UC that he (TANNER) had guns that they could use for the "lick."

TANNER reported that he called two people after his guy "T" went to jail and recruited them

to help with the armed robbery. TANNER further stated that KEITH CALVERT and FRED

CALVERT had told him they had guns, but he never saw a weapon.

49.     Agents also met with KEITH CALVERT individually and read him his *Miranda*

rights. KEITH CALVERT put his initials next to each of those rights on the written

statement of rights form indicating that he understood each right. KEITH CALVERT signed

a written waiver of those rights and agreed to be interviewed by the agents. In a signed,

written statement, KEITH CALVERT then stated that his cousin, TANNER, had asked him

and his brother, FRED CALVERT, to help TANNER get some kilograms of cocaine and that

they would get some money for helping out. KEITH CALVERT reported that he and FRED

CALVERT made two calls to try to get an AK-47 assault rifle, but no one would bring one.

KEITH CALVERT further admitted that he knew the .25 caliber handgun was in the van.

50.    Based on the foregoing facts, your Affiant respectfully submits that there is probable cause to believe that RODNEY TANNER a/k/a "T-mac," KEITH CALVERT and FRED CALVERT conspired to possess with the intent to distribute in excess of five kilograms of cocaine, in violation of Title 21, United States Code, Section 846, and carried and possessed a firearm in furtherance of the conspiracy, in violation of Title 18, United States Code Section 924(c).

FURTHER AFFIANT SAYETH NOT.

Mark Shaffer
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives


Subscribed and sworn to before me this 26th day of October, 2007

Arlander Keys
United States Magistrate Judge

-20-